# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

FRANK WILLIAM CHOATE,

        Defendant-Appellant.

UNPUBLISHED
October 28, 2014

No. 314438
Lapeer Circuit Court
LC No. 11-010879-FH

---

Before: BOONSTRA, P.J., and MARKEY and K. F. KELLY, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of first-degree felony murder, MCL 750.316(1)(b), first-degree home invasion, MCL 750.110a(2), receiving or concealing a stolen firearm, MCL 750.535b(2), receiving or concealing stolen property worth $1,000 or more but less than $20,000, MCL 750.535(3)(a), obstruction of justice, MCL 750.505, felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. On remand from this Court[1], defendant was resentenced, as a fourth habitual offender, MCL 769.12, to life imprisonment without the possibility of parole for the first-degree murder conviction, 20 to 40 years' imprisonment for the first-degree home invasion conviction, 4 to 15 years' imprisonment each for the receiving or concealing a stolen firearm, receiving or concealing stolen property, obstruction of justice, and felon in possession of a firearm convictions, and two years' imprisonment for the felony-firearm conviction. We affirm.

## I. DEFENDANT'S BRIEF ON APPEAL

Defendant first argues that the trial court abused its discretion in admitting evidence of defendant's prior other acts. We disagree. "This Court reviews evidentiary decisions for an abuse of discretion." *People v Martzke*, 251 Mich App 282, 286; 651 NW2d 490 (2002). A trial

---

[1] See *People v Choate*, unpublished order of the Court of Appeals, entered February 6, 2014 (Docket No. 314438).

court abuses its discretion when its decision falls outside the range of principled outcomes. *People v Blackston*, 481 Mich 451, 460; 751 NW2d 408 (2008).

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

"To be admissible under MRE 404(b), bad-acts evidence must satisfy three requirements: (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *People v Kahley*, 277 Mich App 182, 184-185; 744 NW2d 194 (2007). Also, the trial court, on request, may instruct the jury regarding the limited use of the evidence. *People v Watson*, 245 Mich App 572, 577; 629 NW2d 411 (2001). See also *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).

> Evidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on a defendant's character. Evidence is *inadmissible* under this rule *only* if it is relevant *solely* to the defendant's character or criminal propensity. Stated another way, the rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character. Any undue prejudice that arises because the evidence also unavoidably reflects the defendant's character is then considered under the MRE 403 balancing test, which permits the court to exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. [*People v Mardlin*, 487 Mich 609, 615-616; 790 NW2d 607 (2010) (footnotes omitted; emphasis in original).]

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Moreover, all relevant evidence is prejudicial; only *unfairly* prejudicial evidence may be excluded. *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005). "Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury." *Id*. at 614. Such unfair prejudice may arise where considerations extraneous to the merits of the case are injected, such as jury bias, sympathy, anger, or shock. *Id*.

In *People v Sabin (After Remand)*, 463 Mich 43, 63; 614 NW2d 888 (2000), our Supreme Court held that "evidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." "There

must be *such a concurrence of common features* that the charged acts and the other acts are logically seen as part of a general plan, scheme, or design." *People v Steele*, 283 Mich App 472, 479; 769 NW2d 256 (2009). "Distinctive and unusual features are not required to establish the existence of a common plan or scheme." *Kahley*, 277 Mich App at 185.

Here, in finding the prior other acts evidence admissible, the trial court stated:

> In the case at bar, the prior incident occurred in 1989 of forcing entry into a building that the defendant knew for certain was unoccupied, mirrors the conduct at issue before this Court; hence, this Court finds that this evidence is logically relevant to several issues other than establishing a propensity for wrongdoing and is therefore admissible under MRE 404(B). As long as the evidence in question is not being used to show action in conformity with character, it is admissible whether such other crimes, wrongs, or acts are contemporaneous with, or prior, or subsequent to the conduct at issue in the case. In the case at bar, the similar acts evidence was offered to show a plan or scheme, and to establish the absence of mistake. These are permissible purposes; and since one cannot look into the human mind, what one intends must usually be deduced from what one does.

> Furthermore, the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. Prejudice inures when marginally probative evidence would be given undue or preemptive weight by the jury.

> Next, with respect to creating an impermissible inference that the defendant had a propensity to break into buildings which he knows are unoccupied, this Court notes that 404(B) is a rule of inclusion rather than exclusion. Again, *People v Vandervliet* is the lead case. Within the rule's exceptions are intent, scheme, plan, or system in doing an act, and the absence of mistake or accident, all of which are applicable to the present case.

> The complained-of actions establish the defendant's modus operandi or pattern of action, and the unlikeliness of any coincidence or misrecollection on behalf of the immediate victim. Furthermore, although the defendant may be prejudiced by the admission of this evidence, this Court will certainly take great caution and give a cautionary instruction in regard to the jury's consideration of the other bad acts evidence that the Court has determined is admissible.

We find no abuse of discretion in the admission of the evidence of defendant's prior acts. The prior acts involved defendant's breaking into an electronic stereo business in October 1989 and stealing stereo equipment. Defendant gave a statement to police on October 14, 1989, minimizing his involvement by claiming that he did not break into the building but only permitted his brother and another person to put the stolen items in defendant's truck. Defendant and his cohorts put the stolen merchandise on the side of a dirt road to pick up later. In an unrelated court proceeding in 2009, however, defendant admitted that, in fact, he did break into the stereo equipment business and said that his October 14, 1989 statement minimizing his

involvement was merely an effort "to get myself out of the situation I was in, you know, just saying whatever I could, whatever I had to."

Similarly, the present case involves defendant's breaking into the victim's home to steal property. Defendant admitted to a fellow jail inmate, Kevin Hawley, that defendant and others broke into the victim's house to steal valuable merchandise. Testimony by the victim's daughter and grandson established that jewelry, guns, gun parts, and a wallet were missing from the victim's home after the break-in and murder. As in the 1989 incident, defendant gave a statement to police that minimized his involvement; defendant claimed that an unnamed person had borrowed defendant's coat, murdered the victim, and then borrowed defendant's car to dispose of the victim's body. And similar to the disposal of stolen merchandise in the 1989 incident, evidence related to the present crimes, Warren's body, was placed along a secluded dirt road. Additionally, defendant admitted that he knew where the stolen property was located, which suggested that it had been stored at some location.

We conclude that the prior acts and the instant case bear sufficient similarity to suggest a common plan, scheme, or system. In both instances, the evidence reflects that defendants broke-in to steal property, hid evidence of the crime along the side of a dirt road, and minimized his involvement when questioned by the police. Given the concurrence of common features, a logical inference exists that the crimes in this case were part of a common plan or system of breaking into buildings to steal property, hiding evidence in remote locations, and then, if caught, telling police that another person committed the crime but used defendant's vehicle to dispose of evidence. *Steele*, 283 Mich App at 479. Defendant emphasizes that the prior acts occurred 17 years before the present offenses. But remoteness in time of the other act relates to the weight of the evidence rather than its admissibility. *People v Brown*, 294 Mich App 377, 387; 811 NW2d 531 (2011). Further, "[l]ogical relevance is not limited to circumstances in which the charged and uncharged acts are part of a single continuing conception or plot." *Sabin*, 463 Mich at 64. It is true that the 1989 incident involved a break-in of a business whereas the present case involves a home invasion. Still, a trial court does not abuse its discretion in admitting other acts evidence where "reasonable persons could disagree on whether the charged and uncharged acts contained sufficient common features to infer the existence of a common system used by defendant in committing the acts." *Id*. at 67. A "trial court's decision on a close evidentiary question such as this one ordinarily cannot be an abuse of discretion." *Id*. For these reasons, we conclude that the other acts evidence was admitted for a proper purpose and was logically relevant on the issue whether defendant committed the charged acts as part of a common plan, scheme, or system.

Further, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. "Whether other-acts evidence is more prejudicial than probative is best left to the contemporaneous assessment of the trial court." *McGhee*, 268 Mich App at 614 (citation omitted). Unfair prejudice exists when evidence with little probative value will tend to be given too much weight by the jury, including by injecting extraneous considerations such as jury bias, sympathy, anger, or shock. *Id*. Here, the evidence was highly probative because it was relevant to the issue whether defendant broke into the victim's home and stole her property as part of a common plan, scheme, or system. The evidence did not inject any improper extraneous considerations. Also, the danger of unfair prejudice was minimized by the trial court's limiting instruction, in which the court told the jury that the evidence could be considered only in determining whether it showed that defendant used a plan, system, or characteristic scheme that

-4-

he had used before or since. The court emphasized to the jury that it must not decide that the evidence showed defendant is a bad person or is likely to commit crimes, and that the jury could not convict defendant because it thought he was guilty of other bad conduct. This cautionary instruction was given both immediately after the other acts testimony and again during the trial court's final instructions to the jury. Jurors are presumed to follow a trial court's instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Defendant makes a general assertion that the introduction of this evidence violated his federal and state constitutional due process rights, but the substance of his argument is focused on MRE 404(b)(1) and case law applying that rule. In any event, given that the admission of the other acts evidence was proper, we find no basis to conclude that defendant's due process rights were violated. See *Kahley*, 277 Mich App at 186 (finding no due process violation in the proper introduction of other acts evidence).

Defendant's next argument on appeal is that the trial court erred in admitting his statements to police. We disagree. This Court reviews de novo the determination whether a defendant's statements were voluntarily made. *People v Sexton (After Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000). This Court also reviews de novo whether a *Miranda*[2] waiver was knowing and intelligent. *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010). However, a trial court's factual findings are reviewed for clear error. *People v Daoud*, 462 Mich 621, 629; 614 NW2d 152 (2000). "A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that a mistake was made." *People v Shipley*, 256 Mich App 367, 373; 662 NW2d 856 (2003). This Court defers to the trial court's assessment of the weight of the evidence and the credibility of witnesses. *Id*.

The right against compelled self-incrimination is protected by both the United States and Michigan Constitutions. US Const, Am V; Const 1963, art 1, § 18; *Dickerson v United States*, 530 US 428, 433; 120 S Ct 2326; 147 L Ed 2d 405 (2000); *People v Cortez*, 299 Mich App 679, 691; 832 NW2d 1 (2013). "To protect a defendant's Fifth Amendment privilege against self-incrimination, custodial interrogation must be preceded by advice to the accused that 'he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " *Cortez*, 299 Mich App at 691, quoting *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). "Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights." *Gipson*, 287 Mich App at 264, citing *Miranda*, 384 US at 444, and *Daoud*, 462 Mich at 633. "Whether a statement was voluntary is determined by examining police conduct, but the determination whether it was made knowingly and intelligently depends, in part, on the defendant's capacity." *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005). "[T]he prosecution has the burden of establishing a valid waiver by a preponderance of the evidence." *Daoud*, 462 Mich at 634.

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988).]

The absence or presence of any one factor is not dispositive. *Id*. "The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Id.*

Here, the trial court properly determined that defendant's statements were voluntary. Defendant was 41 years old when arrested, and there was no issue concerning his education or intelligence level. Defendant had extensive prior experience with the police. The questioning was not repeated or prolonged, and he was not detained for a lengthy period before making the statement. There was no issue of an unnecessary delay in bringing defendant before a magistrate. Although defendant was taking medication for pain, bipolar disorder, and manic depression, and had used medical marijuana in the morning before he was arrested on July 13, 2011, there is no evidence that defendant was intoxicated or impaired when he gave the statements, aside from his vague, self-serving assertions that he felt disoriented on July 14, 2011 and that his "mind was altered" due to fatigue. Detective Sergeant Jason Parks, who conducted the interviews, testified that defendant answered background questions accurately and quickly, that he did not appear to be under the influence of drugs or intoxicants, and that he seemed to understand the nature of the proceedings. Defendant said and wrote before the July 13, 2011 interview that he was not under the influence of the marijuana he had used that morning. Defendant's physician, Dr. Hatem Ataya, could not opine whether defendant's medications would affect his cognitive ability but acknowledged there was no indication in defendant's medical record that he was confused or had difficulty understanding or communicating with Dr. Ataya. Further, defendant was not deprived of food, sleep, or medical attention. On the contrary, when defendant asked to postpone the interview on July 13, 2011 so he could sleep, his request was honored, and he was taken to a jail cell where he could eat dinner and sleep until the next morning. Defendant was offered breakfast sandwiches the next morning before the interview began. Defendant admitted that he was not physically abused or threatened with abuse. Overall, the record establishes that defendant's statements were voluntary.

Although defendant does not frame the issue in this manner, the prosecution interprets defendant's brief as arguing that his waiver of his Fifth Amendment rights was not knowing and intelligent. Assuming that defendant intended to make that argument, it would lack merit.

Whether a waiver was made knowingly and intelligently requires an inquiry into defendant's level of understanding, irrespective of police conduct. A

defendant does not need to understand the consequences and ramifications of waiving his or her rights. A very basic understanding of those rights is all that is necessary. Intoxication from alcohol or other substances can affect the validity of a waiver, but is not dispositive. [*Gipson*, 287 Mich App at 265 (citations omitted).]

The test is not whether it was wise or smart to admit culpability. *Tierney*, 266 Mich App at 710. "[A] defendant need only know of his available options and make a rational decision, not necessarily the best decision." *Id*.

Defendant was given *Miranda* warnings when he was arrested, and he was again advised of his rights both before the July 13, 2011 interview, and before the July 14, 2011 interview. Before both interviews, defendant signed forms acknowledging that he was advised of his rights. There is no evidence that defendant lacked a basic understanding of the rights that he waived. Detective Parks testified that defendant answered the preliminary background questions quickly and accurately and did not seem to be under the influence of drugs or intoxicants. Although defendant was taking medication and had used medical marijuana on the morning of July 13, 2011, there is no evidence that he was intoxicated or impaired when he waived his rights. Further, Dr. Ataya's testimony did not establish that defendant's bipolar disorder and manic depression prevented him from having a basic understanding of his rights. Although Dr. Ataya asserted generally that a depressed person who is arrested "may be in a disaster," he did not elaborate on what this meant and qualified the statement by saying, "I'm not sure, you know." Dr. Ataya acknowledged that many people treated for bipolar disorder are functioning members of the community who lead active and normal lives and that there was no indication in defendant's medical records of confusion or a change in his cognitive ability during the time that Dr. Ataya saw him. The record establishes that defendant made a knowing and intelligent waiver.

Defendant next argues that he was denied the effective assistance of counsel when defense counsel stipulated to the admission of defendant's larceny from a person conviction as the predicate offense for the felon in possession of a firearm charge. We disagree. "A claim of ineffective assistance of counsel is a mixed question of law and fact." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). This Court reviews any findings of fact for clear error, but the ultimate constitutional issue arising from an ineffective assistance claim is reviewed de novo. *Id*. Regard should be given to the trial court's opportunity to assess the credibility of the witnesses who appeared before it. MCR 2.613(C); *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008). A finding is clearly erroneous when, although there is evidence to support it, this Court, on the whole record, is left with a definite and firm conviction that a mistake was made. *Id*.

"To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability [exists] that the outcome of the proceeding would have been different but for trial counsel's errors." *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). "Defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." *Petri*, 279 Mich at 411. This Court does not substitute its judgment for that of counsel regarding matters of trial strategy, nor does it assess counsel's performance with the

benefit of hindsight. *Id*. The fact that a defense strategy ultimately fails does not establish ineffective assistance of counsel. *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001).

Defendant argues that defense counsel was ineffective because he stipulated to disclosing defendant's prior conviction of larceny from a person as the predicate offense for the felon in possession of a firearm charge. According to defendant, entering this stipulation constituted deficient performance because it revealed that defendant had previously committed a crime against a person involving a theft like what was alleged to have occurred in this case.

It is true that when a defendant is charged with felon in possession of a firearm, the fact of the defendant's prior conviction may be introduced by stipulation without revealing its specific nature in order to minimize any prejudice. See *People v Green*, 228 Mich App 684, 691-692; 580 NW2d 444 (1998). At the *Ginther*[3] hearing, defense counsel explained why he allowed the jury to hear that the prior conviction was larceny from a person:

> Really it came down two-fold: Number one, we knew as a result of the prior bad acts evidence that I had objected to strenuously, and that's part of the record I know as well, that we were going to be having testimony regarding prior criminal behavior on behalf of [defendant], 23 years prior. Secondarily, we knew we had a jailhouse issue with an alleged communication made by [defendant] to Mr. Kevin Hawley, so we knew we were going to be having issues regarding – there was an in-custody issue, that there would have been prior criminal activity on his behalf; and as part of our main strategy in the case in chief, we were looking at an issue of a potential sexual assault that had been committed against the victim.

> We had brought forth testimony from Dr. [Kanu] Virani[, the medical examiner who conducted the autopsy of the victim,] regarding a vaginal tear. He was the forensic pathologist. We had also brought across the issue, from both our expert and the evidence technicians, regarding semen that was also found on a comforter with epithelial cells of the victim. Part of the strategy in stipulating to this is we didn't want to have the jury speculate as to the nature of what the past criminal conviction was and have it potentially go into their minds that this could be a criminal sexual conduct case in the past, because that would be detrimental to my client on a tremendously massive level. And also part of our defense, we had taken a look at the issue that my client had nothing to hide, so we didn't want to have the jury taking the case back with an idea that there was concealment.

Defense counsel also testified that defendant was actively involved in his defense and in strategy discussions and did not disagree with defense counsel's strategy on this issue. Defense counsel testified regarding his discussions with defendant on this issue:

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

*Q.* Without getting into privilege, did you discuss the issue of whether or not to disclose the nature of his prior conviction?

*A.* Yes.

*Q.* And based on your discussions that you had with [defendant], did you act in a manner consistent with what you understood the agreement to be between you and [defendant]?

*A.* Yes.

Defense counsel also noted in connection with the potential sexual assault of the victim that part of the defense strategy was to suggest the victim's grandson as a potential suspect:

*Q.* In this case there was a potential issue, or I guess a potential, that [the victim] had been sexually assaulted in some way.

*A.* It was a part of our defense strategy that all we had done is to further a line of investigation that was originally done by the Lapeer County Sheriff's Department in that they were reviewing [the victim's grandson] as a potential suspect in this case for quite a while. To be quite honest, we just picked up that line of reasoning and took that to our experts who testified before the jury.

After quoting defense counsel's testimony, the trial court rejected defendant's argument that he was deprived of the effective assistance of counsel:

Based on the aforementioned testimony, it seems rather apparent that defense counsel strategically decided to reveal the name and nature of defendant's prior felony conviction, rather than allow the jury to speculate on the nature of that prior felony. Significantly, [d]efendant agreed with this decision. Counsel's decision is presumed to be sound trial strategy. Defendant has not rebutted this presumption. Accordingly, [d]efendant has failed to show that counsel's performance was deficient.

Even assuming that [defense counsel's] performance could be deemed constitutionally deficient for failing to stipulate to the prior conviction without naming it, this Court concludes that [d]efendant was not actually prejudiced as a result. By virtue of the total evidence presented at trial, including, but not limited to, [d]efendant's self-incriminating statements made to police and the hair collected from a bed sheet in [the victim's] residence matching his DNA profile, overwhelming evidence existed on the record for a reasonable jury to conclude beyond a reasonable doubt that [d]efendant committed the charged offenses. [Footnote omitted.]

We agree with the trial court's analysis. Defense counsel's testimony set forth his strategic reasons, with which defendant agreed, for identifying the prior conviction. Some evidence at trial arguably suggested that a sexual assault occurred, including the vaginal tearing discovered during the autopsy, the presence of semen on the comforter, and the fact that the body

was discovered nude. Also, the defense was attempting to suggest the victim's grandson as a possible suspect. Therefore, it was a reasonable strategic choice to identify defendant's prior conviction as being larceny from a person so that the jury would not speculate that it was for criminal sexual conduct. Also, the jury was already aware in any event that defendant had committed prior theft-related crimes given that the trial court admitted, over defense counsel's objection, evidence concerning the 1989 breaking and entering offense in which property was stolen. Defendant has failed to overcome the presumption that it was a reasonable strategic choice to identify the nature of the prior conviction that served as the predicate for felon in possession of a firearm.

We further agree with the trial court that, even if defense counsel's performance was constitutionally deficient, defendant has failed to establish a reasonable probability of a different outcome. Considering that a hair containing defendant's DNA profile was found in the victim's bed sheet that was collected from the murder scene, and that defendant made incriminating statements to police, including referring to property that had not been revealed to him as having been stolen from the murder scene, we conclude that it is not reasonably likely that the outcome would have differed if the nature of the prior conviction had been omitted from the stipulation concerning felon in possession of a firearm read to the jury.

Defendant next argues that the trial court erred in requiring defense witness Michael Elrod to testify while shackled and in prison garb. We agree that the trial court erred but conclude that this unpreserved error does not require reversal. Generally, an issue must have been raised by objection in the trial court to be deemed preserved for appellate review. *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000). As defendant concedes, defense counsel did not object at trial to Elrod's appearing in shackles and prison garb. Hence, the issue is unpreserved. A trial court's decision to shackle a witness is reviewed for an abuse of discretion. *People v Banks*, 249 Mich App 247, 257; 642 NW2d 351 (2002). Because the issue is not preserved, this Court's review of this issue is for plain error affecting substantial rights. *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003). Defendant has the burden of establishing that a clear or obvious error occurred that affected his substantial rights. *Id.* "Reversal is warranted only when the plain, unpreserved error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence." *Id.*

"[T]he propriety of handcuffing or shackling a testifying witness is subject to the same analysis as that for defendants, i.e., the handcuffing or shackling of a witness during trial should be permitted only to prevent the escape of the witness, to prevent the witness from injuring others in the courtroom, or to maintain an orderly trial." *Banks*, 249 Mich App at 257. Here, the trial court did not find that shackling was necessary to prevent Elrod from escaping or injuring others in the courtroom, or to maintain an orderly trial. Instead, the court merely stated that it would not be "worried about the niceties" and that inmates who testified as witnesses would "be dressed in prison garb" and "come out here the way they're dressed." As the trial court acknowledged following the *Ginther* hearing on remand, this comprised an error because the court did not make the necessary finding under *Banks*.

But we further agree with the trial court's analysis on remand concluding that the error does not require reversal. Handcuffing or shackling a defense witness does not adversely and

-10-

unfairly affect a defendant's presumption of innocence and thereby deny the defendant a fair and impartial trial. *Id*. at 259. "While handcuffs on a testifying witness other than a defendant sends the message to the jury that the court considers the witness to be untrustworthy and even dangerous, it does not send a concurrent suggestion that the defendant is a person predisposed to commit crimes or that the defendant is a dangerous person who cannot be trusted." *Id*. Nonetheless, reversal may be required to the extent that the credibility of the shackled witness is crucial to the defendant's defense; "the fairness of the trial must not be undermined by destroying the credibility of a witness before the witness even gets the opportunity to testify." *Id*. at 260.

Here, Elrod's credibility was not crucial to the defense. The defense focused largely on the absence of physical evidence other than the hair matching defendant's DNA profile found in the victim's bed sheet and on the purported unreliability of defendant's statements to police. Further, although Hawley – a former inmate who testified for the prosecution that defendant made inculpatory statements and who, according to Elrod, said he was going to fabricate a statement against defendant – did not testify in prison garb and shackles, he was not an inmate at the time of trial. Moreover, the jury was aware that both Hawley and Elrod were convicted felons as they were incarcerated at the time their alleged conversations took place. The trial court instructed the jury regarding the consideration of the past criminal convictions of Hawley and Elrod:

> You have heard testimony from two witnesses, a Kevin Hawley and a Michael Elrod, who have each been convicted of crimes in the past. You should judge these witnesses' testimony the same way you judge the testimony of any other witness. You may consider their past criminal convictions along with all the other evidence when you decide whether you believe their testimony and how important you think it is.

"Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

Further, even if the jury had believed Elrod's testimony impeaching Hawley's claims that defendant confessed to the crime, that testimony was not outcome-determinative given the other significant evidence of defendant's guilt. A hair containing defendant's DNA profile was found in the victim's bed sheet that was collected from the murder scene, and defendant made incriminating statements to police, including referring to property that had not been revealed to defendant as having been stolen from the murder scene. Overall, defendant has failed to establish that the trial court's error in requiring Elrod to testify in shackles and prison garb affected defendant's substantial rights.

Defendant further argues that defense counsel was ineffective for failing to object to the trial court's decision to require Elrod to appear in shackles and prison garb. We disagree. Defense counsel testified at the *Ginther* hearing concerning why he did not object to the trial court's decision to require Elrod to testify in prison garb and shackles:

*Q.* All right. So the jury was well-informed of the fact that these conversations between these witnesses all took place while incarcerated at the Lapeer County Jail; correct?

*A.* Yes.

*Q.* So any alleged prejudice or potential prejudice that would occur to Kevin Hawley, to your client, or even to Mr. Elrod, all that had already been exposed to the jury; the warts were already there. Would that be a fair statement?

*A.* Yes, but it also went a little bit further than that.

*Q.* Go ahead.

*A.* Mr. Elrod had nothing to gain.

*Q.* Explain that.

*A.* Mr. Elrod offered testimony about things that occurred without receiving any type of jail credit, any type of reduction in his sentence, without receiving one single thing in return. That was also part of our strategy, that Kevin Hawley is testifying and stating that this is what happened and that stating that he didn't receive anything in return; yet the testimony of [Lt. Gary] Parks[, the officer in charge,] ultimately refuted that.

Mr. Elrod came here in prison blues. He could have easily told me, "I refuse to testify. If you put me on that stand, I'm not going to say a word." He came here to testify on behalf of someone that he believed was not – at least in terms of the issue of Mr. Hawley – had no involvement with this whatsoever. That Kevin Hawley was a liar, and he got nothing in return. That, to me, from a strategy standpoint, was critical to a jury.

And we raised that also, I believe, in my closing argument, that Mr. Hawley is telling you one thing. He got something and lied to you about it. Mr. Elrod got nothing and he's here to testify. And I think I made some statement about the issue of the fact that he was in the prison garb and that shouldn't reduce the credibility of his testimony simply because of that, when what you have to look at, is he has nothing to gain; nothing.

*Q.* It's fair to say that Kevin Hawley, who testified for the prosecution, was no longer in custody and in plain clothes?

*A.* Yes.

*Q.* And Mr. Elrod, who was testifying against Mr. Hawley was had [sic] prison blue?

*A.* Yes.

-12-

*Q.* Is it fair to say that that also can sort of highlight your fact that the guy with nothing to gain doesn't get anything from the prosecutor, but the one that does, gets something?

*A.* I guess that would be fair.

* * *

*Q.* You had indicated there was a specific way you wanted your client to look in this particular case?

*A.* Correct.

*Q.* And I think that to be fair to the defendant's new attorneys, their strategy is, "Well, jeez, if that theory applies, [defense counsel], that you're concerned about how people look, why weren't you then concerned about how Mr. Elrod looked when he testified?"

*A.* Because, once again, it went into the strategy of he had nothing to gain; and, if anything, rather than reducing the credibility of his testimony, it was my view on it that it potentially augmented it. He didn't even get a coke from me, a soda pop, nothing, and that was what we tried to impart to the jury, that he was here of his own free will, that he just wants the truth to come out about this particular issue with Mr. Hawley.

Defendant has not rebutted the strong presumption that defense counsel's strategy in declining to object to Elrod's appearance in prison garb and shackles was sound. Defendant argues that defense counsel could have made the point that Elrod received no benefit for testifying by simply asking him that question. But defense counsel's testimony reflected that he viewed Elrod's appearance in prison blues as potentially augmenting rather than reducing Elrod's credibility because it showed that, in purported contrast to Hawley, Elrod received no benefit from testifying. This was a reasonable strategic choice that this Court cannot second-guess with the benefit of hindsight. *Petri*, 279 Mich at 411. But even if defense counsel's failure to object were constitutionally deficient performance, defendant has failed to establish a reasonable likelihood of a different outcome had counsel objected. As discussed, Elrod's credibility was not crucial to the defense; the jury was well aware of the past criminal convictions of both Hawley and Elrod; the court instructed the jury regarding the effect of those past convictions on the jury's credibility determinations, and there was significant evidence of defendant's guilt independent of Hawley's testimony.

Defendant's next argument on appeal is that the imposition of a $130 crime victim's rights assessment violated the prohibition on ex post facto laws. We disagree. To preserve an argument that the crime victim's rights assessment violated the Ex Post Facto Clauses of the United States and Michigan Constitutions, US Const, art I, § 10; Const 1963, art 1, § 10, a defendant must raise the issue in the trial court. *People v Earl*, 297 Mich App 104, 111; 822 NW2d 271 (2012) (*Earl I*), aff'd 495 Mich 33 (2014). As defendant concedes, he did not raise this issue below. Because this issue is unpreserved, this Court's "review is limited to plain error affecting defendant's substantial rights." *Id.* An issue of statutory construction in determining

-13-

whether a statutory scheme is civil or criminal is reviewed de novo. *People v Earl*, 495 Mich 33, 35-36; 845 NW2d 721 (2014) (*Earl II*).

"The Ex Post Facto Clauses of the United States and Michigan Constitutions bar the retroactive application of a law if the law: (1) punishes an act that was innocent when the act was committed; (2) makes an act a more serious criminal offense; (3) increases the punishment for a crime; or (4) allows the prosecution to convict on less evidence." *Id.* at 37, citing *Calder v Bull*, 3 US (3 Dall) 386, 390; 1 L Ed 648 (1798). Defendant argues that the imposition of a $130 crime victim's rights assessment violated the prohibition on ex post facto laws because the crimes in this case occurred on October 1, 2006, before the December 16, 2010 effective date of a statutory increase of the assessment from $60 to $130. See 2010 PA 281; MCL 780.905(1)(a); *Earl II*, 495 Mich at 35 ("The statute was amended effective December 16, 2010 . . . to raise the crime victim's rights assessment for convicted felons to $130."). Thus, defendant suggests, the statutory increase in the crime victim's rights assessment increased his punishment.

Our Supreme Court in *Earl II* rejected the very argument defendant is making. The *Earl II* Court held that the imposition of a $130 crime victim's rights assessment for crimes committed before the effective date of the statutory increase did not violate the bar on ex post facto laws. *Earl II*, 495 Mich at 35. The *Earl II* Court summarized its holding and analysis:

> We conclude that an increase in the crime victim's rights assessment does not violate the bar on ex post facto laws because the Legislature's intent in enacting the assessment was civil in nature. Additionally, the purpose and effect of the assessment is not so punitive as to negate the Legislature's civil intent. Therefore, we affirm the judgment of the Court of Appeals that the increase in the crime victim's rights assessment does not violate the Ex Post Facto Clauses of the Michigan and United States Constitutions. [*Id*. at 49-50.]

In light of the holding in *Earl II*, defendant's argument lacks merit.

Defendant also contends that the original judgment of sentence improperly reflects a $470 total crime victim's rights assessment. See MCL 780.905(2) ("The court shall order a defendant to pay only 1 assessment under subsection (1) per criminal case."). On remand, however, the trial court resentenced defendant and entered an amended judgment of sentence that correctly reflects a total crime victim's rights assessment of $130. Because defendant has already received relief on this aspect of the issue, there is no further relief this Court could fashion, and the claim is moot. See *People v Cathey*, 261 Mich App 506, 510; 681 NW2d 661 (2004) ("An issue is moot when an event occurs that renders it impossible for the reviewing court to fashion a remedy to the controversy."). This Court generally does not decide moot issues. *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998).

Defendant next raises two additional sentencing issues that are moot because defendant received the requested relief when he was resentenced on remand. We therefore do not reach those issues. *Id*.

-14-

## II. DEFENDANT'S STANDARD 4 BRIEF

Defendant raises additional arguments in his Standard 4 brief. As discussed below, none of these arguments have merit.

Defendant first argues in his Standard 4 brief that there was insufficient evidence to support his first-degree felony murder and first-degree home invasion convictions. We disagree. To determine whether there was sufficient evidence to support a conviction, this Court reviews the evidence de novo, in the light most favorable to the prosecutor, to determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Odom*, 276 Mich App 407, 418; 740 NW2d 557 (2007). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "All conflicts in the evidence must be resolved in favor of the prosecution." *Id*. "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

> The elements of felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316(1)(b)]. [*People v Nowack*, 462 Mich 392, 401; 614 NW2d 78 (2000).]

"The facts and circumstances of the killing may give rise to an inference of malice. A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999) (citation omitted). Further, "it is well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

The jury was instructed on an aiding and abetting theory in this case. MCL 767.39 provides:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

Our Supreme Court has explained:

> The general rule is that, to convict a defendant of aiding and abetting a crime, a prosecutor must establish that (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal

-15-

intended its commission at the time that the defendant gave aid and encouragement. [*People v Moore*, 470 Mich 56, 67-68; 679 NW2d 41 (2004) (quotation marks and brackets omitted).]

"The requisite intent for conviction of a crime as an aider and abettor is that necessary to be convicted of the crime as a principal." *People v Mass*, 464 Mich 615, 628; 628 NW2d 540 (2001) (quotation marks omitted).

Here, there was sufficient evidence to establish the elements of felony-murder. First, evidence establishes that the victim was killed: Her blood covered her bed, and her lifeless body was found along the side of a dirt road with the face "pretty brutally smashed in." An autopsy determined that death was a homicide caused by numerous blows to the head and face. Further, there was evidence that defendant either inflicted the fatal blows or aided and encouraged the person who did so. A hair matching defendant's DNA profile was found on the victim's bed sheet that was collected from the murder scene. Defendant suggests that his hair could have been transferred to the victim's bed sheet during an unrelated visit by defendant's brother, but the record offers scant support for such a theory and, in any event, the prosecution is not required to negate every reasonable theory consistent with the defendant's innocence. *People v Solmonson*, 261 Mich App 657, 661; 683 NW2d 761 (2004). Defendant made inculpatory statements to the police referring to property that was stolen from the home, including an item that had not previously been disclosed to defendant as having been stolen. Defendant also made statements to Hawley indicating that: defendant and other persons invaded the victim's home; the victim tried to defend herself; an altercation occurred; one of defendant's accomplices killed her; and defendant and his cohorts disposed of her body. Defendant calls Hawley's testimony "very questionable at best," but "[t]his Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *Kanaan*, 278 Mich App at 619. In "reviewing claims of insufficient evidence, this Court must make all reasonable inferences and resolve all credibility conflicts in favor of the jury verdict." *Solmonson*, 261 Mich App at 661. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that defendant, if not acting as the principal, performed acts or gave encouragement that assisted in killing the victim.

Second, the facts and circumstances of the killing support a reasonable inference of malice. As discussed, blood was discovered all over the victim's bed. A witness who found the victim's body described her face as "pretty brutally smashed in." The autopsy revealed that there were numerous serious, forceful blows to the victim's face and head. The medical examiner indicated that the blows could have been inflicted by any kind of instrument or a fist. A rational trier of fact could infer that defendant had the requisite malice given the numerous serious blows inflicted and the presence of defendant's hair on the bed sheet collected from the blood-covered bed. It is reasonable to infer that defendant set in motion a force likely to cause death or great bodily harm when he engaged in the home invasion. See *Carines*, 460 Mich at 760. Even if defendant did not intend to kill the victim when he entered her home, "the nature of the killing established that it was neither accidental nor done without malice. Defendant at the very least became aware of his cohort's intent during the events in question." *Id*.

Third, there was evidence that defendant committed or assisted in committing larceny

when the victim was killed.  The amended felony information charged that defendant committed the murder while perpetrating or attempting to perpetrate larceny.  See MCL 750.316(1)(b) (including "larceny of any kind" as one of the underlying felonies for establishing felony murder).  The essential elements of larceny are:

> (1) an actual or constructive taking of goods or property, (2) a carrying away or asportation, (3) the carrying away must be with a felonious intent, (4) the subject matter must be the goods or personal property of another, [and] (5) the taking must be without the consent and against the will of the owner.  [*People v Cain*, 238 Mich App 95, 120; 605 NW2d 28 (1999), quoting *People v Anderson*, 7 Mich App 513, 516; 152 NW2d 40 (1967).]

"[T]he specific intent necessary to commit larceny is the intent to steal another person's property."  *Cain*, 238 Mich App at 120.  That is, there must be an intent to permanently deprive the owner of his or her property.  *Id*. at 119.  Here, numerous items were missing from the victim's home after the murder, including jewelry, a wallet, guns, a gun safe, and gun parts. Defendant later made statements to the police indicating that he knew where some of the stolen property was located. Defendant told Hawley that he and his cohorts invaded the victim's home and knew she had valuable merchandise.  Taken together, this evidence establishes that property belonging to the victim or her grandson was taken and carried away by defendant and his cohorts with the intent to steal it and without the owner's consent.  Therefore, a rational trier of fact could conclude that defendant committed or assisted in committing larceny when the victim was killed.  Accordingly, the prosecution presented sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that defendant committed felony murder.

First-degree home invasion can be committed in various ways, including when: (1) the defendant enters a dwelling without permission; (2) the defendant intends when entering to commit a larceny, or at any time while entering, present in, or exiting the dwelling commits a larceny; and (3) another person is lawfully present in the dwelling.  *People v Wilder*, 485 Mich 35, 43; 780 NW2d 265 (2010).  Here, as discussed, there was evidence that defendant entered the victim's dwelling given the presence of a hair with defendant's DNA profile in the victim's bed sheet and defendant's statements to Hawley and the police.  It is reasonable to infer that defendant lacked permission to enter given that defendant told Hawley that he invaded the victim's home and given the physical evidence of a struggle, including the blood on the victim's bed and the brutal blows the victim suffered.  Defendant's statement to Hawley indicated that he intended to commit a larceny when entering the victim's home, and there is evidence that defendant and his cohorts committed a larceny while present in the victim's home given the property that was missing after the murder and defendant's statements to police reflecting that he knew where some of the stolen property was located.  Finally, another person, the victim, was lawfully present in the dwelling when defendant and his accomplices entered her home. Accordingly, the prosecution presented sufficient evidence to establish first-degree home invasion beyond a reasonable doubt.

Defendant next argues in his Standard 4 brief that he was denied the effective assistance of counsel because defense counsel failed to interview possible defense witnesses, failed to investigate an alibi defense, and failed to present any defense theory.  We disagree.  To preserve a claim of ineffective assistance of counsel, a defendant must move for a new trial or a *Ginther*

-17-

evidentiary hearing. *Petri*, 279 Mich App at 410. Defendant did not file such a motion with respect to this part of his ineffective assistance of counsel claim. Because defendant did not preserve this issue, this Court's review is limited to mistakes apparent on the existing record. *Id.*

"Decisions regarding whether to call or question witnesses are presumed to be matters of trial strategy." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). "In general, the failure to call a witness can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009) (internal quotation marks omitted). A defense is substantial if it might have made a difference in the outcome. *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009).

Defense counsel has a duty to undertake reasonable investigations or to make a reasonable decision that renders particular investigations unnecessary. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). Any choice to limit an investigation "is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* (quotation marks omitted). The failure to conduct an adequate investigation comprises ineffective assistance of counsel if it undermines confidence in the outcome of the trial. *Russell*, 297 Mich App at 716. A defendant claiming ineffective assistance has the burden of establishing the factual predicate for the claim. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

Here, defendant contends that he gave defense counsel a list of purported "alibi" witnesses and summarized for defense counsel what those witnesses would say. According to defendant, many of these witnesses would have testified that Hawley made up his statement regarding defendant's confession to him, and other witnesses would have indicated that two other men supposedly admitted to committing the crime. Another witness would have said she was with defendant's brother when the crime occurred, and there allegedly would have been testimony that defendant's brother once visited the victim's home to purchase a camper and motor home. Defendant asserts that defense counsel failed to interview these witnesses, investigate an alibi defense, present the witnesses at trial, or present any defense theory. Defendant also claims that defense counsel improperly advised defendant not to testify at trial.

The record is devoid of any support for defendant's allegations. There is no evidence that defendant gave his purported list of witnesses to defense counsel or summarized what those witnesses would say. Even if defendant did so, there is no evidence that defense counsel failed to interview those witnesses or failed to investigate a possible alibi defense. Nor is there evidence that the purported witnesses would have testified in the manner defendant claims. Although this issue was not the focus of the *Ginther* hearing on remand, we note that defense counsel testified at that hearing that he discussed the case with numerous inmates who had shared a pod in the Lapeer County jail with defendant, Hawley, and Elrod, including at least one of the witnesses that defendant asserts defense counsel did not interview. This testimony is unrebutted. Overall, defendant has failed to support the contention that defense counsel performed an inadequate investigation or lacked strategic reasons for declining to call the witnesses at issue. See *Odom*, 276 Mich App at 417 (rejecting an ineffective assistance claim where defense counsel's alleged failure to properly investigate a case was not apparent from the existing record).

Further, contrary to defendant's assertion, defense counsel presented evidence in support of numerous defense theories at trial. Defense counsel presented testimony of a DNA, serology, and crime scene investigation expert to support the theory that defendant's hair could have been transferred to the victim's bed sheet by defendant's brother, suggest that DNA samples could have been mixed up or mislabeled, question the manner in which the hair was collected and handled in the police laboratory, note the presence of the victim's grandson's semen mixed with the victim's epithelial cells on the comforter found in the victim's bedroom[4], opine that the victim's body being found naked from the neck down was a red flag of a possible sexual homicide, and assert that the police should have tested vaginal swabs to determine whether the victim was sexually penetrated by a man who ejaculated externally. Defense counsel also presented Elrod's testimony to impeach Hawley's testimony and to indicate that Hawley had said he was going to fabricate a statement against defendant.

In addition, defendant expressly waived his right to testify on the record, stating that he understood he had the right to testify in his own behalf, that he had spoken to his attorneys about the matter, and that he had concluded it was in his best interest not to testify. There is no evidence to support defendant's assertion that defense counsel's advice in this regard was inadequate or improper.

For all these reasons, defendant has failed to establish a factual predicate for his ineffective assistance claims. *Carbin*, 463 Mich at 600. Defendant contends that the cumulative effect of counsel's errors rendered the result of the trial unreliable. But defendant has failed to establish any ineffective assistance on defense counsel's part. Because there was no single error, there was no cumulative effect of multiple errors that requires reversal. *People v Rodriguez*, 251 Mich App 10, 37; 650 NW2d 96 (2002).

Defendant's final argument in his Standard 4 brief is that the trial court erred in admitting his statements to police. But as discussed earlier, the trial court did not err in admitting defendant's statements. Defendant's Standard 4 brief asserts that he was coerced in various ways, makes vague references to violence, and asserts that he was psychologically coerced through promises of leniency and sympathy and by virtue of advanced intoxication. There is no support in the record for these assertions. Detective Parks testified that no promises or threats were made to defendant. Defendant admitted at the *Walker* hearing that he was not assaulted, abused, threatened with abuse, or treated disrespectfully. There is no evidence that defendant was intoxicated or impaired when he waived his rights. Dr. Ataya's testimony did not establish that defendant's bipolar disorder and manic depression prevented him from having a basic understanding of his rights. Defendant further asserts that he invoked his right to silence and sought to cut off questioning, and that he requested an attorney. Again, there record provides no support for these appellate contentions. When defendant asked to postpone the interview on July

---

[4] The victim's grandson testified that the comforter was used in various rooms of the house, including his bedroom and the living room, and that the comforter could have contained his semen because of his unrelated sexual activity. Prosecution experts indicated that a person's sperm cells may mix with another person's epithelial cells on a bedding item that is shared.

13, 2011 so he could sleep, his request was honored, and questioning resumed the next day as defendant had agreed to do. Overall, the record affords no support for any of the arguments set forth in defendant's Standard 4 brief on this issue. As discussed above, the record establishes that defendant made a voluntary, knowing, and intelligent waiver of his Fifth Amendment rights.

We affirm.

/s/ Mark T. Boonstra
/s/ Jane E. Markey
/s/ Kirsten Frank Kelly