# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

## PEOPLE v EARL

Docket No. 145677. Argued October 8, 2013 (Calendar No. 3). Decided March 26, 2014.

Ronald L. Earl was convicted by a jury in the Oakland Circuit Court of bank robbery and two counts of possession of less than 25 grams of a controlled substance. At the time defendant committed the offenses, MCL 780.905 required that all defendants convicted of a felony pay a $60 crime victim's rights assessment. The statute was amended effective December 16, 2010, to raise the assessment for convicted felons to $130. At defendant's sentencing on February 15, 2011, the court, Leo Bowman, J., ordered defendant to pay the $130 crime victim's rights assessment under MCL 780.905(1)(a). Defendant appealed. The Court of Appeals, K. F. KELLY, P.J., and SAWYER and RONAYNE KRAUSE, JJ., affirmed. 297 Mich App 104 (2012). The Supreme Court granted defendant's application for leave to appeal. 493 Mich 945 (2013).

In a unanimous opinion by Justice CAVANAGH, the Supreme Court *held*:

The Ex Post Facto Clauses of the United States and Michigan Constitutions bar retroactive application of a law if the law (1) punishes an act that was innocent when the act was committed, (2) makes an act a more serious criminal offense, (3) increases the punishment for a crime, or (4) allows the prosecution to convict on less evidence. Determining whether application of a law violates the Ex Post Facto Clauses by increasing the punishment for a crime is a two-step inquiry. The court must begin by determining whether the Legislature intended the statute as a criminal punishment or a civil remedy. If the Legislature's intent was to impose a criminal punishment, retroactive application of the law violates the Ex Post Facto Clauses and the analysis is over. If the Legislature intended to enact a civil remedy, the court must ascertain whether the statutory scheme is so punitive in purpose or effect as to negate the Legislature's intent to deem it civil. The crime victim's rights assessment is a civil remedy. The Legislature's use of the term "assess" in MCL 780.905 indicates a nonpunitive intent. That intent is underscored by the fact that the statute imposes a flat fee that is not dependent on the facts of the case. The fee also has a nonpunitive purpose: funding crime victim's services, thereby promoting public safety and welfare. Nor is the assessment so punitive in purpose or effect as to negate the Legislature's intent to deem it a civil remedy: the sanction does not impose an affirmative disability or restraint, imposition of the assessment has not historically been deemed a form of criminal punishment, imposition of the assessment does not promote the traditional aims of punishment, the assessment has a rational connection to a nonpunitive purpose, and the assessment is not excessive with respect to that purpose. Accordingly, imposition of the

increased crime victim's rights assessment did not violate the Ex Post Facto Clauses of the United States and Michigan Constitutions.

Affirmed.

©2014 State of Michigan

# Opinion

Chief Justice:          Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
                        Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano

FILED MARCH 26, 2014

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v              No. 145677

RONALD LEE EARL,

   Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

  This case requires us to determine whether the imposition of an increased Crime Victim's Rights Fund assessment violates the Ex Post Facto Clauses of the Michigan and United States Constitutions. US Const, art I, § 10; Const 1963, art 1, § 10. We hold that it does not. Specifically, we hold that the trial court's order requiring defendant to pay a $130 crime victim's rights assessment does not violate the bar on ex post facto laws. Accordingly, we affirm the judgment of the Court of Appeals.

## I. FACTS AND PROCEDURAL HISTORY

On March 18, 2010, defendant robbed a bank in Southfield, Michigan. He was arrested six days later, and heroin and crack cocaine were found on his person at the time of the arrest. Defendant was charged with and convicted of bank robbery and two counts of possessing less than 25 grams of a controlled substance. At the time defendant committed the offenses, MCL 780.905 required that all defendants found guilty of a felony pay a $60 crime victim's rights assessment. 1996 PA 344. The statute was amended effective December 16, 2010, however, to raise the crime victim's rights assessment for convicted felons to $130. 2010 PA 281. Defendant was sentenced on February 15, 2011, and was ordered to pay $130 for the crime victim's rights assessment. Defendant appealed and claimed, among other things, that the increased assessment was an increased punishment in violation of the Ex Post Facto Clauses of the Michigan and United States Constitutions. The Court of Appeals affirmed the $130 assessment, holding that it is not punitive, and, therefore, does not violate the bar on ex post facto laws. *People v Earl*, 297 Mich App 104, 114; 822 NW2d 271 (2012). Defendant sought leave to appeal in this Court, which we granted. *People v Earl*, 493 Mich 945 (2013).

## II. STANDARD OF REVIEW

"Whether a statutory scheme is civil or criminal is . . . a question of statutory construction." *Smith v Doe*, 538 US 84, 92; 123 S Ct 1140; 155 L Ed 2d 164 (2003) (citation and quotation marks omitted). The interpretation of a statute is a question of law that this Court reviews de novo. *Herman v Berrien Co*, 481 Mich 352, 358; 750 NW2d 570 (2008).

2

## III. ANALYSIS

### A. THE CRIME VICTIM'S RIGHTS FUND

The Crime Victim's Rights Fund is contained within the Crime Victim's Rights Act, MCL 780.751 *et seq.* The Crime Victim's Rights Act was enacted in response to the growing recognition of the concerns regarding disproportionate treatment of crime victims and a perceived insensitivity to their plight. *People v Grant*, 455 Mich 221, 239-240; 565 NW2d 389 (1997). In 1989, the Crime Victim Services Commission was established as part of the Crime Victim's Rights Act and was given the following duties:

> (a) Investigate and determine the amount of revenue needed to pay for crime victim's rights services.
>
> (b) Investigate and determine an appropriate assessment amount to be imposed against convicted criminal defendants and juveniles for whom the probate court or the family division of circuit court enters orders of disposition for juvenile offenses to pay for crime victim's rights services.
>
> (c) By December 31 of each year, report to the governor, the secretary of the senate, the clerk of the house of representatives, and the department the commission's findings and recommendations under this section. [MCL 780.903.]

The Legislature established the Crime Victim's Rights Fund to pay for crime victim's rights services. MCL 780.904(1). The Crime Victim's Rights Fund is funded by the crime victim's rights assessment. MCL 780.904. Currently, a convicted felon is assessed $130, those convicted of misdemeanors are assessed $75, and juveniles are assessed $25 when the court enters an order of disposition for a juvenile offense. MCL 780.905(1) and (3). Money remaining in the Crime Victim's Rights Fund after victim's services have been paid for may be used for crime victim compensation. MCL 780.904(2). See, also, MCL 18.351 to MCL 18.368. Excess revenue that has not been used for crime victim

3

compensation may be used to establish and maintain a statewide trauma system. MCL 780.904(2).

## B. EX POST FACTO CLAUSE[1]

The Ex Post Facto Clauses of the United States and Michigan Constitutions bar the retroactive application of a law if the law: (1) punishes an act that was innocent when the act was committed; (2) makes an act a more serious criminal offense; (3) increases the punishment for a crime; or (4) allows the prosecution to convict on less evidence. *Calder v Bull*, 3 US (3 Dall) 386, 390; 1 L Ed 648 (1798). At issue in this case is whether an increase in the crime victim's rights assessment increases the punishment for a crime.

Determining whether a law violates the Ex Post Facto Clause is a two-step inquiry. *Smith*, 538 US at 92. The court must begin by determining whether the Legislature intended the statute as a criminal punishment or a civil remedy. *Id*. If the Legislature's intention was to impose a criminal punishment, retroactive application of the law violates the Ex Post Facto Clause and the analysis is over. *Id*. However, if the Legislature intended to enact a civil remedy, the court must also ascertain whether "the statutory

---

[1] The language contained in the Michigan Constitution's Ex Post Facto Clause, Const 1963, art 1, § 10, is nearly identical to the language contained in the federal constitution, US Const, art I, § 10. Neither party addressed whether our Ex Post Facto Clause provides greater protections than its federal counterpart. See *Wortman v R L Coolsaet Constr Co*, 305 Mich 176, 179; 9 NW2d 50 (1943) (stating that if an issue is not briefed, it is generally considered abandoned). In any event, decisions of our Court of Appeals indicate that "Michigan's Ex Post Facto Clause is not interpreted more expansively than its federal counterpart," *In re Contempt of Henry*, 282 Mich App 656, 682; 765 NW2d 44 (2009), citing *People v Callon*, 256 Mich App 312, 317; 662 NW2d 501 (2003), and, thus, for purposes of this case, we treat the two provisions as coextensive.

4

scheme is so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Id.* (citations and quotation marks omitted). Stated another way, even if the text of the statute indicates the Legislature's intent to impose a civil remedy, we must determine whether the statute nevertheless functions as a criminal punishment in application. Because we conclude that the Legislature did not intend the crime victim's rights assessment to be a criminal punishment, we will address both issues.

## C. WHETHER THE LEGISLATURE INTENDED THE CRIME VICTIM'S RIGHTS ASSESSMENT TO BE PUNITIVE

When determining whether the Legislature intended for a statutory scheme to impose a civil remedy or a criminal punishment, a court must first consider the statute's text and its structure. *Smith*, 538 US at 92. Specifically, a court must ask whether the Legislature, "indicated either expressly or impliedly a preference for one label or the other." *Hudson v United States*, 522 US 93, 99; 118 S Ct 488; 139 L Ed 2d 450 (1997) (citation and quotation marks omitted). In considering whether a law is a criminal punishment, a court "generally bases its determination on the purpose of the statute." *Trop v Dulles*, 356 US 86, 96; 78 S Ct 590; 2 L Ed 2d 630 (1958). "If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal." *Id*. However, a statute is intended as a civil remedy if it imposes a disability to further a legitimate governmental purpose. *Id*. "The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The controlling nature of such statutes normally depends on the evident purpose of the legislature." *Id*. When giving effect to the Legislature's intent, we first focus on the statute's plain language.

5

*People v Cole*, 491 Mich 324, 330; 817 NW2d 497 (2012) (citations and quotation marks omitted).

*Cole*, 491 Mich at 336-337, concluded that imposing lifetime electronic monitoring for a conviction of first or second-degree criminal sexual conduct constituted a criminal punishment.[2]  In support of that conclusion, *Cole* noted that the Legislature included monitoring as part of the sentence.  *Id*. at 336 ("The use of the directive 'shall *sentence*' indicated that the Legislature intended to make lifetime electronic monitoring part of the sentence itself.") (emphasis added).  While the crime victim's rights assessment is imposed *at the time of sentencing*, MCL 769.1k(1)(*iv*), in contrast to *Cole*, the Legislature did not expressly manifest an explicit intent to make the assessment *part of the sentence itself*.  Rather, the Crime Victim's Rights Act statutory scheme leads to the opposite conclusion—that the crime victim's rights assessment does not have a label, function, or purpose that is consistent with a criminal sentence or penalty.

Specifically, nothing on the face of the Crime Victim's Rights Act expressly indicates that the Legislature intended the crime victim's rights assessment to be a criminal punishment.  However, the use of the label "assessment," as opposed to "fine" or "penalty," is instructive.  The Legislature is aware that a fine is generally a criminal punishment.  Indeed, the Michigan Penal Code defines "crime" as an act or omission

---

[2] While *Cole* was not an ex post facto case, and instead considered whether due process mandates that a criminal defendant is informed of the lifetime electronic monitoring requirement before pleading guilty or no contest for criminal sexual conduct, *Cole*, 491 Mich at 327, *Cole*'s analysis is relevant to this case because the analysis used to determine whether the law imposes a criminal penalty is the same.  *Id*. at 334, citing *Smith*, 538 US at 92.

6

forbidden by law that is punishable upon conviction by a "[f]ine not designated a civil fine." MCL 750.5. Accordingly the Legislature's decision to use the term "assess" as opposed to "fine" or another similar term within the Crime Victim's Rights Act implies a nonpunitive intent.

While labels alone do not determine whether a statutory provision is a criminal punishment or civil remedy, *Smith*, 538 US at 94 ("[t]he location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one"), the function of the crime victim's rights assessment is true to its label as an assessment. "Assessment" is defined as "the action or instance of assessing," and "assess" is defined as "to impose according to an established rate." *Merriam-Webster's Collegiate Dictionary* (8th ed). On the other hand, a criminal fine is generally imposed as a punishment in response to criminal conduct. See *Southern Union Co v United States*, 567 US ___, ___; 132 S Ct 2344, 2350; 183 L Ed 2d 318 (2012) (explaining that "[c]riminal *fines* . . . are penalties inflicted by the sovereign for the commission of offenses") (emphasis added). Therefore, the terms "fine" and "assessment" have different and distinct meanings: criminal fines are generally responsive to the conduct which they intend to punish, while assessments are imposed in accordance with a predetermined flat rate.

Specifically, the crime victim's rights assessment levies a flat fee against a convicted criminal defendant, irrespective of the number or severity of the charges. The monetary value of the assessment depends only on whether the crimes constituted a misdemeanor or a felony, and whether the defendant is a juvenile. MCL 780.905. Moreover, MCL 780.905(2) imposes only one assessment per criminal case, contrary to

7

the manner in which punitive fines are usually imposed, i.e., where the amount of the fine generally depends on the specific facts of the case. *Southern Union Co*, 567 US at ___; 132 S Ct at 2350. Therefore the crime victim's rights assessment does not have the label of, nor does it function like, a criminal punishment.

Additionally, the crime victim's rights assessment has a nonpunitive purpose: to provide funding for crime victim's services. The Legislature made it clear that funding crime victim's services is the primary goal of the Crime Victim's Rights Act. Specifically, MCL 780.907(2), which governs the disbursement of the Crime Victim's Rights Fund monies, states that the Department of Community Health "shall make the implementation of crime victim's rights" a priority. Further, MCL 780.908, which governs the use of disbursed funds, requires a court, department, or local agency receiving a distribution under the act to use the distribution to "maintain or enhance crime victim's rights services." Only after the crime victim's rights services have been paid for may money from the fund be used for other purposes under the Crime Victim's Rights Act. See MCL 780.904(2) (implying that the fund first must disburse the amount that the Crime Victims' Services Commission determined was necessary to fund crime victim's services).

Although the crime victim's rights assessment places a burden on convicted criminal defendants, the assessment's purpose is not to punish but to fund programs that support crime victims. See *Trop*, 356 US at 96 (explaining that while a statute may have both penal and nonpenal attributes, the "controlling nature" depends on the Legislature's purpose). As the Legislature envisioned, the crime victim's rights assessment primarily provides funding for crime victim's services. Included among the services supported by

8

the fund are "comprehensive mandatory rights of crime victims to participate in and be notified of all pertinent proceedings in the criminal justice process, compensation for crime related losses, and training of advocates to better assist victims." Michigan Department of Community Health, *Crime Victims Services Commission Annual Report FY 2012* (2012), p 5. The crime victim's rights assessment, therefore, funds a variety of programs that benefit the health and safety of crime victims and other community members.

Finally, more generally, the crime victim's rights assessment is an exercise of the Legislature's power to protect the health and safety of Michigan citizens, indicating that it is a civil remedy. In this regard we find the facts of *Smith* instructive. *Smith*, 538 US at 93, considered whether the Alaskan Sex Offender Registry Act imposes a criminal punishment or a civil remedy. The United States Supreme Court held that the Alaskan Legislature expressed a civil objective in the act itself, explaining that " '[n]othing on the face of the statute suggests that the legislature sought to create anything other than a civil . . . scheme designed to protect the public from harm.' " *Id*., citing *Kansas v Hendricks*, 521 US 346, 361; 117 S Ct 2072; 138 L Ed 2d 501 (1997). The Court further explained that "where a legislative restriction 'is an incident of the State's power to protect the health and safety of its citizens,' it will be considered as 'evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment.' " *Smith*, 538 US at 93-94, quoting *Flemming v Nestor*, 363 US 603, 616; 80 S Ct 1367; 4 L Ed 2d 1435 (1960). The Court also determined that the goal was "plainly more remedial than punitive" and "even if the objective of the Act is consistent with the purposes of the Alaska criminal justice system, the State's pursuit of it in a regulatory scheme does not

9

make the objective punitive." *Smith*, 538 US at 94 (citations and quotation marks omitted).

Like *Smith*'s consideration of the Alaskan Legislature's purpose, we conclude that the Michigan Legislature's goal in crafting the Crime Victim's Rights Act was to promote public safety and welfare by providing notification and support services to crime victims. And, even if the assessment in some ways resembles a criminal fine, as *Smith* explained, the Crime Victim's Rights Act's regulatory purpose to protect the health and safety of Michigan crime victims controls over any punitive effect the act may otherwise have. Therefore, we hold that the Legislature intended the crime victim's rights assessment to be a civil remedy.

### D. WHETHER THE CRIME VICTIM'S RIGHTS ASSESSMENT IS PUNITIVE IN PURPOSE OR EFFECT

Because we conclude that the Legislature intended that the crime victim's rights assessment be civil in nature, we must determine whether it is nevertheless "so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Smith*, 538 US at 92 (citations and quotation marks omitted). When analyzing whether an act has the purpose or effect of being punitive, courts consider seven factors noted in *Kennedy v Mendoza-Martinez*, 372 US 144, 168-169; 83 S Ct 554; 9 L Ed 2d 664 (1963). *Smith*, 538 US at 97. The factors as considered in *Mendoza-Martinez* are:

> [1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected

is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned. [*Mendoza-Martinez*, 372 US at 168-169.]

The factors are "neither exhaustive nor dispositive . . . but useful guideposts." *Id.* (citations and quotation marks omitted). Further, courts will "reject the legislature's manifest intent [to impose a civil remedy] only where a party challenging the statute provides the clearest proof that the statutory scheme is so punitive either in purpose or effect to negate the . . . intention to deem it civil." *Hendricks*, 521 US at 361 (citations and quotation marks omitted). See, also, *Smith*, 538 US at 105.

Turning to the *Mendoza-Martinez* factors, the first factor weighs against finding a punitive purpose or effect because the crime victim's rights assessment does not impose an affirmative disability or restraint. The relevant inquiry when determining whether a law imposes an affirmative disability or restraint is "how the effects of the [a]ct are felt by those subject to it." *Smith*, 538 US at 99-100. "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Id*. at 100. The assessment—a maximum of $130—is " 'certainly nothing approaching the "infamous punishment" of imprisonment.' " *Hudson*, 522 US at 104, quoting *Flemming*, 363 US at 617. See, also, *Smith*, 538 US at 100 ("The act imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint.") (citation omitted). Although the crime victim's rights assessment might have some punitive effects on defendants, to hold that any governmental regulation that has indirect punitive effects constitutes a punishment would undermine the government's ability to engage in effective regulation. *Smith*, 538 US at 102, quoting *Hudson*, 522 US at 105 (stating that "[t]o hold that the mere presence of a deterrent purpose renders such

11

sanctions 'criminal' . . . would severely undermine the Government's ability to engage in effective regulation," and explaining that many government programs may deter crimes without imposing a punishment).

Likewise, the second factor does not weigh in favor of the crime victim's rights assessment being punitive in purpose or effect because the crime victim's rights assessment has not been regarded in our history and traditions as a form of criminal punishment. While, as explained earlier, criminal *fines* have been regarded as punishment, the crime victim's rights assessment does not share the characteristics of punitive fines because it imposes a flat fee irrespective of the underlying criminal conduct. Additionally, charging convicted criminal defendants a fee in order to pay for victim's services is a relatively new concept that was first introduced by 1989 PA 196, which created the Criminal Assessments Commission, the predecessor of the Crime Victim Services Commission, MCL 780.901 to MCL 780.911. The general nature of the assessment's legislative scheme has not changed and the aim of the assessment has always been to provide crime victim's services. Therefore, the assessment is not now, nor has it ever been, regarded as a punishment.

The fourth factor also fails to indicate a punitive purpose or effect because the crime victim's rights assessment does not promote the traditional aims of punishment: retribution and deterrence. *Hendricks*, 521 US at 361-362. The assessment is not retributive because it does not consider the underlying factual nature of the crimes committed nor the number of convictions in determining the fee assessed. And, while the fees assessed under the act depend on the type of conviction or adjudication—i.e., felony, misdemeanor, or juvenile—that distinction is reasonably related to the goal of requiring

12

convicted criminal defendants to bear the cost of crime victim's services. Cf. *Smith*, 538 US at 102 (explaining that "[t]he broad categories [used to distinguish classes of offenders in Alaska's Sex Offender Registration Act] and the corresponding length of the reporting requirement, are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective"). Nor can the act be said to promote the aims of deterrence, given that any deterrent effect is minimal. The small fee imposed by the assessment is unlikely to have a *significant* deterrent effect in light of the other potential consequences of criminal punishment, such as additional and greater fines and costs and incarceration.

The sixth factor also does not imply a punitive purpose or effect because the crime victim's rights assessment has a rational connection to a nonpunitive purpose. It is "most significant" that while the assessment might have some punitive aspects, it serves "important nonpunitive goals." *United States v Ursery*, 518 US 267, 290; 116 S Ct 2135; 135 L Ed 2d 549 (1996). The notion of crime victim's rights is of such importance that it is mandated by the Michigan Constitution. Const 1963, art 1, § 24. As previously discussed, the goal of the Crime Victim's Rights Fund, and, therefore, of the crime victim's rights assessment, is to fund crime victim's services to help protect crime victim's rights. Indeed, the Crime Victim's Rights Fund provides funding for mandatory services required by art 1, § 24 of the Michigan Constitution and other services mandated by crime victim's rights legislation.[3] Any punitive effects are incidental to the goal of

---

[3] The Crime Victim's Rights Fund provides funding to implement and support services required by the Crime Victim's Rights Act, 1985 PA 87, for costs associated with supporting the Michigan Crime Victim Notification Network and its automated victim

13

funding crime victim's services, which is rationally connected to the assessment itself. The decision to place the burden of funding the Crime Victim's Rights Fund on those who are convicted of a crime or adjudicated and on those juveniles who are responsible for a crime is simply a rational policy decision.

Finally, the seventh factor also fails to show a punitive purpose or effect because the crime victim's rights assessment is not excessive with respect to its purpose. As noted, each criminal defendant is subject to the assessment, irrespective of the number of convictions, and the cost imposed is relatively low in relation to other fines imposed within the criminal process. Although the increase in the assessment amount may impose a hardship on some, the assessment is set at the rate that the Crime Victims' Services Commission determines is necessary to adequately fund the crime victim's services programs. MCL 780.903(b). Because of the operation of inflation and other unavoidable cost increases, it is necessary that the amount of the crime victim's rights assessment be periodically increased in order to fund the same level of services. The increased assessment, therefore, was not the result of a policy choice to impose a harsher punishment on defendants for their conduct, but instead was necessary in order to provide the services mandated under the Crime Victim's Rights Act. The amount imposed ensures that there is adequate funding to provide the services required by law. There is no evidence that the assessment is excessive in relation to its purpose.

---

notification system, fulfilling the notification requirements of Const 1963, art 1, § 24, and crime victim compensation pursuant to 1976 PA 223. See *Crime Victims Services Commission Annual Report FY 2012*, pp 3-8.

*Smith* found the remaining two *Mendoza-Martinez* factors—the third, whether the crime victim's rights assessment only comes into play on a finding of scienter and the fifth, whether the behavior the crime victim's rights fund applies to is already a crime—generally unhelpful in its ex post facto analysis, and we agree.[4] The underlying conduct of the defendant will always constitute a crime, but, as explained, the assessment is not responsive to that specific conduct. Instead, the assessment only applies a flat fee determined by the level of criminal conduct—i.e., whether the underlying conviction constitutes a misdemeanor or felony. Likewise, a finding of scienter is unhelpful because regardless whether the underlying conduct constitutes a strict liability felony (requiring no criminal intent) or a crime requiring the most depraved criminal intent (such as premeditated murder) the assessment treats the conduct exactly the same by imposing a flat fee. Therefore, both of these factors carry little weight in our analysis.

Overall, when considering the *Mendoza-Martinez* factors as analyzed in *Smith*, there is not the "clearest proof" that the crime victim's rights assessment is "so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Smith*, 538 US at 92 (citations and quotation marks omitted).[5]

---

[4] *Smith* found the factors unhelpful because Alaska's Sex Offender Registration Act was designed to address criminal recidivism, and, therefore, the underlying conduct must always be a crime and involve scienter. *Smith*, 538 US at 94.

[5] We acknowledge that several federal courts of appeal have concluded that a retroactive assessment of an increased "special assessment" similar to the crime victim's rights assessment at issue in this case constitutes a violation of the Ex Post Facto Clause. See, e.g., *United States v Prather*, 205 F3d 1265, 1272 (CA 11, 2000); *United States v Labeille-Soto*, 163 F3d 93, 101-102 (CA 2, 1998). We decline to follow those cases because the parties in those cases agreed that imposition of the increased assessment violated the Ex Post Facto Clause. *Prather*, 205 F3d at 1272 (stating that both parties

## IV. CONCLUSION

We conclude that an increase in the crime victim's rights assessment does not violate the bar on ex post facto laws because the Legislature's intent in enacting the assessment was civil in nature. Additionally, the purpose and effect of the assessment is not so punitive as to negate the Legislature's civil intent. Therefore, we affirm the judgment of the Court of Appeals that the increase in the crime victim's rights assessment does not violate the Ex Post Facto Clauses of the Michigan and United States Constitutions.

Michael F. Cavanagh
Robert P. Young, Jr.
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

---

agreed that the district court had erred by levying a special assessment of $100 per count against Prather because the Ex Post Facto Clause of the Constitution forbids retroactive application of criminal sanctions); *Labeille-Soto*, 163 F3d at 101-102 ("The government, which sat mute when the court imposed the $100 assessment at the sentencing hearing, concedes the correctness of this [Ex Post Facto] challenge.").

Later cases reaching the same conclusion simply cite *Prather* and *Labeille-Soto* for the proposition that retroactively applying the increased assessment would violate the Ex Post Facto Clause without engaging in any analysis. See, e.g., *United States v Jones*, 489 F3d 243, 254 n 5 (CA 6, 2007). Likewise, state courts addressing similar issues as those presented in this case that have found ex post facto violations have relied on concessions or simply stated that conclusion with little supporting analysis. See, e.g., *People v Sullivan*, 6 AD3d 1175, 1175-1176; 775 NYS2d 696 (2004); *Taylor v State*, 586 So 2d 964, 965 (Ala Crim App, 1991). Accordingly, we find these cases unpersuasive and unhelpful.