[J-121B-2016] [OAJC: Dougherty, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 47 MAP 2016 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court at No. 2169 MDA 2014 dated |
| | : | August 7, 2015 Affirming the Order of |
| v. | : | the Court of Common Pleas of |
| | : | Cumberland County, Criminal Division, |
| | : | at No. CP-21-CR-0000903-2006 dated |
| JOSE M. MUNIZ, | : | October 14, 2014. |
| | : | |
| Appellant | : | ARGUED:  December 6, 2016 |

## CONCURRING OPINION

**JUSTICE WECHT**                                                **DECIDED:  July 19, 2017**

I agree that the retroactive application of Pennsylvania's Sex Offender Registration and Notification Act ("SORNA") violates Article I, Section 17 of the Pennsylvania Constitution. I do not agree that "Pennsylvania's *ex post facto* clause provides even greater protections than its federal counterpart." *See* Opinion Announcing the Judgment of the Court ("OAJC") at 55.

The Pennsylvania Constitution prohibits the General Assembly from enacting *ex post facto* laws, one type of which are laws that retroactively increase the punishment for a particular crime. *See Calder v. Bull*, 3 U.S. 386, 390 (1798); *Commonwealth v. Kalck*, 87 A. 61, 62 (Pa. 1913). To determine whether a specific law inflicts a punishment, this Court traditionally has used the United States Supreme Court's intent-effects test. *See Smith v. Doe*, 538 U.S. 84, 92-102 (2003) (applying the intent-effects test in the *ex post facto* context); *Lehman v. Pa. State Police*, 839 A.2d 265, 271-74 (2003) (same). Under that framework, as the lead opinion explains, we first determine

whether the General Assembly meant to impose a punishment. *Smith*, 538 U.S. at 92. If so, our inquiry ends there. But if the General Assembly instead sought to create a civil (non-punitive) regulatory scheme, we turn to *Smith*'s second prong, under which we consider whether the law is "so punitive either in purpose or effect as to negate [the legislature's] intention to deem it civil." *Id.* (quoting *United States v. Ward*, 448 U.S. 242, 248-49 (1980) (internal quotation marks omitted)). In making this assessment, the seven *Mendoza–Martinez*[1] factors serve as "useful guideposts," *Hudson v. United States*, 522 U.S. 93, 99 (1997), but they are "neither exhaustive nor dispositive." *Ward*, 448 U.S. at 249.

The lead opinion begins its analysis of SORNA using the intent-effects framework and concludes that the General Assembly intended to create a non-punitive statutory scheme. *See* OAJC at 27-29. The lead opinion then goes on to find that SORNA's punitive effect is so overwhelming that it negates the General Assembly's intent. *See* OAJC at 29-45. Because I agree with both of these conclusions, I also agree that SORNA (as applied to Muniz) violates Article I, Section 17 of the Pennsylvania Constitution.[2]

---

[1] *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963).

[2] I would resolve this case on state constitutional grounds, and decline to address Muniz's claim that SORNA also violates the *ex post facto* clause of the United States Constitution. The lower federal courts disagree as to whether sex-offender registration laws violate the federal *ex post facto* clause, and the United States Supreme Court may accept review of one such dispute in the coming months. *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016), *petition for cert. filed*, 2016 WL 7335854 (U.S. Dec. 14, 2016) (No. 16-768); *see Snyder v. Does #1-5*, 580 U.S. ___, 137 S.Ct. 1395 (U.S. Mar. 27, 2017) (inviting the Acting Solicitor General to file a brief expressing the views of the United States). Under these circumstances, I would simply hold that SORNA violates Article I, Section 17 of the Pennsylvania Constitution—a determination for which this Court is the final arbiter. *Michigan v. Long*, 463 U.S. 1032, 1041 (1983) ("If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not (continued…)

Rather than stop here, the lead opinion goes one step further and concludes that the *ex post facto* clause of the Pennsylvania Constitution provides greater protection than its federal counterpart. As I explore in more detail below, there is little textual or historical support for this conclusion, and this Court's Article I, Section 17 decisions make the lead opinion's reasoning even less tenable. Thus, I simply would reiterate here what this Court has said many times before: the United States Supreme Court's interpretation of the federal *ex post facto* clause is entirely consistent with our understanding of Pennsylvania's clause. *See Commonwealth v. Young*, 637 A.2d 1313, 1317 n.7 (Pa. 1993).

To determine whether a particular provision of the Pennsylvania Constitution protects individual liberty to a greater extent than an analogous clause in the United States Constitution, we must evaluate: (1) the text of the Pennsylvania constitutional provision; (2) the history of the provision, including Pennsylvania case law; (3) related case law from other states; and (4) policy considerations, including unique issues of state and local concern. *Commonwealth v. Edmunds*, 586 A.2d 887, 895 (Pa. 1991).

## I.    Text

In addressing the first *Edmunds* factor, we must compare the text of Article I, Section 17 of the Pennsylvania Constitution with that of Article I, Section 10 of the United States Constitution.[3] The former provides that "[n]o *ex post facto* law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special

---

(…continued)
themselves compel the result that the court has reached."); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("[S]tate courts are the ultimate expositors of state law.").

[3]    The United States Constitution has two provisions that prohibit *ex post facto* laws: one that restricts Congress (Article I, Section 9) and one that applies to the several states (Article I, Section 10).

privileges or immunities, shall be passed." PA. CONST. art. I, § 17. Similarly, the latter directs that "[n]o State shall . . . pass any Bill of Attainder, *ex post facto* Law, or Law impairing the Obligation of Contracts . . . ." U.S. CONST. art. I, § 10. In other words, as the lead opinion observes, the current text of Article I, Section 17 is nearly identical to its federal counterpart. OAJC at 49.

Of course, identical language alone does not necessarily indicate identical meaning. *Edmunds*, 586 A.2d at 895-96 ("[W]e are not bound to interpret the two [constitutional] provisions as if they were mirror images, even where the text is similar or identical."). So a thorough examination of the history of the two provisions is necessary.

## II.    History

To say that the rejection of *ex post facto* laws is of early lineage would be an understatement. A presumption against such legislation was recognized in both the Napoleonic Code and the Roman law codification of the Emperor Justinian. *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring) ("The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal.") (citing, *inter alia*, Justinian Code, Book 1, Title 14, § 7 and 1 Code Napoleon, Prelim. Title, Art. I, cl. 2 (B. Barrett trans. 1811)). And the great authorities on British common law considered *ex post facto* laws to be void in and of themselves. 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *46 (stating that *ex post facto* laws are "cruel and unjust"); *Calder*, 3 U.S. at 391 (discussing the similar views of Blackstone's successor, Richard Wooddeson). The Framers, too, had little regard for *ex post facto* laws. Madison considered them to be "contrary to the first principles of the social compact and to every principle of sound legislation," THE FEDERALIST NO. 44, at 282 (James Madison) (Clinton Rossiter ed., 1961), and Hamilton described them as "the

favorite and most formidable instruments of tyranny." THE FEDERALIST NO. 84, at 512 (Alexander Hamilton) (Clinton Rossiter ed., 1961).[4]

Both the historical record and the Constitution's text show that the other delegates to the Constitutional Convention shared Madison and Hamilton's hostility to *ex post facto* laws. Sure, some of the delegates opposed Sections 9 and 10 of Article I. But they did so on the belief that *ex post facto* laws were so unmistakably void that explicitly prohibiting them would "impl[y] an improper suspicion" of the legislature. *See* Suzanna Sherry, *The Founders' Unwritten Constitution,* 54 U. CHI. L. REV. 1127, 1157-58 (1987) (quoting James Madison's notes from the Federal Convention of 1787). In the end, those views did not prevail. The convention's final draft included two *ex post facto* clauses—a testament to the fact that the Framers "viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment." *Fletcher v. Peck*, 10 U.S. 87, 137-38 (1810).

After the ratification of the United States Constitution, the citizens of this Commonwealth adopted the Pennsylvania Constitution of 1790. That charter, much like the United States Constitution, included a clause forbidding the enactment of *ex post facto* laws. As this Court has said in the past, the "same pre-revolutionary-war concerns" that influenced the Framers of the United States Constitution also shaped Pennsylvania's *ex post facto* clause. *See Commonwealth v. Gaffney*, 733 A.2d 616, 621 (Pa. 1999); OAJC at 51.

---

[4] The Framers' hostility toward *ex post facto* laws grew from the British Parliament's practice of enacting "bills of attainder" and "bills of pains and penalties," some of which would retroactively declare innocent acts to be criminal, while others would simply increase the punishment for past offenses. *Calder*, 3 U.S. at 389 (stating that the *ex post facto* clause "very probably arose from the knowledge . . . that the Parliament of Great Britain claimed and exercised a power to pass such laws"). Parliament justified these laws by insisting that they were necessary to preserve "the safety of the kingdom." *Id.*

The 1790 *ex post facto* clause was a bit more concise than the present-day version. It provided simply that "[n]o *ex post facto* law, nor any law impairing contracts, shall be made." PA. CONST. of 1790, art. IX, § 17. Later, the delegates to the Constitutional Convention of 1873 proposed (and the electorate approved) minor revisions to that language—substituting the verb "passed" in the place of the word "made" and adding the phrase "the obligation of" before the word "contracts." These changes are modest, and they seem to reflect little more than a desire to mirror language used in the United States Constitution.

Indeed, records from the 1873 Convention reveal that the amended clause's resemblance to the federal *ex post facto* clause was no coincidence. *See* 5 DEBATES OF THE CONVENTION TO AMEND THE CONSTITUTION OF PENNSYLVANIA 631 (1873) (remarks of Charles R. Buckalew, suggesting that the clause "was intended to follow the language of the Constitution of the United States," and questioning whether some words "were dropped out by accident"); *id.* (remarks of Thomas MacConnell, chairman of the Committee on the Bill of Rights, agreeing that the clause should "conform[ ] to the national Constitution"); *id.* (another delegate, Wayne MacVeagh, correctly predicting that "the desire to harmonize this instrument with the Constitution of the United States will prevail"). The same records confirm that the delegates were familiar with the prevailing judicial interpretation of the United States Constitution's *ex post facto* clause. 3 DEBATES OF THE CONVENTION TO AMEND THE CONSTITUTION OF PENNSYLVANIA 28, 30 (1873) (discussing various judicial decisions, including *Calder v. Bull*). Yet, the Convention vetoed a proposal to expand the scope of our clause beyond the limits that courts had established. 5 DEBATES OF THE CONVENTION TO AMEND THE CONSTITUTION OF PENNSYLVANIA 313-14 (1873) (rejecting a provision that would have barred all retroactive legislation, whether civil or criminal).

Despite this compelling evidence that Pennsylvania's *ex post facto* clause means the same thing that the federal clause does, the lead opinion concludes that this *Edmunds* factor "militates in favor of holding the Pennsylvania clause is even more protective than its federal counterpart." OAJC at 52. Citing an *amicus* brief authored by the Defender Association of Philadelphia and the Pennsylvania Association of Criminal Defense Lawyers, the lead opinion finds that the "location of Pennsylvania's clause within the Declaration of Rights lends considerable force to the argument it provides even more protection than its federal counterpart." *Id.* at 48. As I understand it, the gist of *amici's* argument on this point is that Pennsylvania's *ex post facto* clause must reach further than the federal cause because it falls within our charter's enumerated "rights reserved and retained by the people," whereas "[t]he federal clause is not contained within the Bill of Rights." Brief for Defender Association & PACDL at 37.

*Amici's* theory bases too much upon too little. The reason that the federal clause does not appear in the Bill of Rights is that the clause predates the Bill of Rights.[5] In any event, I fail to see why the Bill of Rights—a collection of amendments that did not limit the power of state governments until after the ratification of the Fourteenth Amendment—would have been a more logical home for a provision that restricts the legislative power of the states. If anything, the presence of a substantive restriction on state police powers in Article I underscores that the Framers regarded the prohibition on *ex post facto* laws as an important "bulwark in favor of personal security and private rights." THE FEDERALIST NO. 44, at 301 (James Madison) (Clinton Rossiter ed., 1961).

---

[5] It is important to remember that the original Constitution purposely did not enumerate individual rights, since some delegates worried that such a list would be construed to deny the public any unexpressed rights. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980).

The lead opinion also asserts that this Court has "noted divergence between" the state and federal *ex post facto* clauses in the past. OAJC at 51. Specifically, the lead opinion highlights language from *Commonwealth v. Lee*, 935 A.2d 865 (Pa. 2007), which suggests that the seventh *Mendoza–Martinez* factor, standing alone, could justify the conclusion that a sanction is punitive. *Id.* at 876 n.24 (stating in *dicta* that "a showing of sufficient excessiveness in Megan's Law II's [registration, notification, and counseling] provisions might warrant a finding that those provisions are punitive"). The lead opinion evidently views this to be in conflict with the United States Supreme Court's oft-quoted warning that "no one [*Mendoza–Martinez*] factor should be considered controlling as they 'may often point in differing directions.'" *Hudson*, 522 U.S. at 101 (quoting *Mendoza-Martinez*, 372 U.S. at 169). In my view, however, there is little tension between these two instructions.

As an initial matter, I fail to see how a court could ever conclude that a particular sanction is "excessive in relation to the *alternative purpose* assigned" (the seventh factor) without first identifying some "*alternative purpose* to which [the sanction] may rationally be connected" (the sixth factor). *Mendoza-Martinez*, 372 U.S. at 168-69. The fact that the seventh factor logically cannot stand alone renders academic any debate about whether that factor would be sufficient in isolation.

More importantly, the United States Supreme Court's *ex post facto* jurisprudence does not foreclose the possibility that a facially non-punitive law might constitute punishment *solely* because it is excessive relative to its regulatory aim. The principle that "no one [*Mendoza-Martinez*] factor should be considered controlling," *Hudson*, 522 U.S. at 101, does not mean that the *Mendoza-Martinez* framework is an exercise in arithmetic, or that at least two of the seven factors must be present before a law can be deemed punitive. Rather, it simply reminds courts to consider all seven of the factors

before reaching a conclusion, since some factors may outweigh others, depending upon the particular statute at issue. In this regard, the Court has emphasized that the seven factors "are all relevant to the inquiry," that they are "neither exhaustive nor dispositive," and that they are "useful guideposts." *Mendoza-Martinez*, 372 U.S. at 169; *Ward*, 448 U.S. at 249; *Smith*, 538 U.S. at 97; *see* Erin Murphy, *Paradigms of Restraint*, 51 Duke L.J. 1321, 1349 (2008) (observing that *Smith*'s second prong "is not applied according to any precise mathematical formulation, . . . and at various times the courts have emphasized particular factors over others.").

Contrary to the lead opinion's suggestion that our decisions indicate "divergence between the clauses," OAJC at 51, I believe that this Court has gone to great lengths to align our own *ex post facto* jurisprudence with decisions from the United States Supreme Court. For example, prior to *Smith*, we analyzed *ex post facto* challenges using the Third Circuit Court of Appeals' three-prong *Artway/Verniero*[6] test. After the United States Supreme Court adopted the intent-effects test in *Smith*, however, we did the same—announcing that we would abandon the *Artway/Verniero* test "[i]n order to promote consistency." *Lehman*, 839 A.2d at 271.

Nor should we ignore that this Court consistently has relied upon federal precedent when resolving state *ex post facto* claims, *see e.g.*, *Young*, 637 A.2d at 1317 (citing *Calder*, 3 U.S. at 390, and *Collins v. Youngblood*, 497 U.S. 37, 40-51 (1990)); *Commonwealth v. Duffy*, 96 Pa. 506, 513 (Pa. 1880) (defining "*ex post facto* laws" consistent with Justice Chase's definition in *Calder*); *Kalck*, 87 A. at 62 (noting that the rule announced in *Calder* remains unchanged), occasionally even going so far as to suggest that the resolution of an "appellant's federal *ex post facto* claim disposes of his

---

[6]     *See Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235 (3d Cir. 1996); *E.B. v. Verniero*, 119 F.3d 1077 (3d Cir. 1997).

state claim as well." *Young*, 637 A.2d at 1317 n.7; *accord Commonwealth v. Fisher*, 741 A.2d 1234, 1238 (Pa. 1999) ("Our interpretation of the state constitutional prohibition against *ex post facto* laws has been consistent with the United States Supreme Court's interpretation of the federal prohibition, and therefore the analysis of Appellant's federal *ex post facto* claim encompasses his state claim.").[7]

### III.    Related Case Law from Other States

The next *Edmunds* factor involves consideration of related case law from other jurisdictions.  Ordinarily, this includes a survey of states that have adopted federal constitutional standards, states that have departed from federal constitutional standards, and the reasons given for each adoption or departure.  Yet, Muniz's entire argument on this *Edmunds* factor consists of quotations from three state courts that have "expressed concern regarding the public's perception and treatment of offenders." Brief for Muniz at 30 (quoting the Maryland, Alaska, and Indiana high courts).  The lead opinion finds these expressions persuasive, and concludes that this *Edmunds* factor suggests Pennsylvania's *ex post facto* clause provides more protection than its federal analogue.  Respectfully, I disagree.

When a statute is challenged on state constitutional grounds, most state high courts apply federal *ex post facto* doctrine (including the four categories from *Calder*,

---

[7]    In at least one later case, the Court did undertake an *Edmunds* analysis, and discerned no basis to conclude that the standards applicable to federal *ex post facto* challenges are inadequate to safeguard the Pennsylvania constitutional right.  *Gaffney*, 733 A.2d at 622 ("Appellant has failed to present any compelling reason for our departure from the standards appropriate for determining whether an *ex post facto* violation pursuant to the federal constitution has occurred and we find no independent reasons for doing so."); *accord Commonwealth v. McElhenny*, 478 A.2d 447, 450 (Pa. Super. 1984) (rejecting the argument that Article I, Section 17 of the Pennsylvania Constitution provides greater protection than the corresponding federal provision, and noting that Pennsylvania courts "have, generally, interpreted the Pennsylvania clause coterminously with the Federal clause").

the intent-effects test from *Smith*, and the seven useful guideposts from *Mendoza–Martinez*).[8]  Even among the state courts that have struck down retroactive sex-offender registration laws on *ex post facto* grounds—a cross section that one would expect to skew in favor of finding more robust state constitutional protections—most have remained loyal to the United States Supreme Court's *ex post facto* jurisprudence.  *See e.g.*, *Doe v. State*, 111 A.3d 1077, 1090 (N.H. 2015) (holding that the New Hampshire Constitution and the United States Constitution "afford the same protection against *ex post facto* laws"); *Starkey v. Oklahoma Dept. of Corr.*, 305 P.3d 1004, 1019 (Okla. 2013) (adopting "the analytical framework used in *Smith v. Doe*"); *State v. Letalien*, 985 A.2d 4, 14 (Me. 2009) (holding that "the *ex post facto* clauses of the Maine and United States Constitutions are interpreted similarly and are coextensive"); *Commonwealth v. Baker*, 295 S.W.3d 437, 442 (Ky. 2009), *cert. denied*, 559 U.S. 992 (2010) (treating the *ex post facto* clauses of the Kentucky and United States Constitutions as one and the same and applying *Smith*'s intent-effects test); *Doe v. State*, 189 P.3d 999, 1007

---

[8]      *See e.g.*, *Riley v. N.J. Parole Bd.*, 98 A.3d 544, 552 (N.J. 2014) ("The New Jersey *Ex Post Facto* Clause is interpreted in the same manner as its federal counterpart."); *Rew v. Bergstrom*, 845 N.W.2d 764, 795 (Minn. 2014) ("[W]e can discern no principled reason, textual or otherwise, to treat the prohibition on *ex post facto* laws in the Minnesota Constitution any differently than its federal counterpart[.]"); *People v. Earl*, 845 N.W.2d 721, 725 n.1 (Mich. 2014) (treating the Michigan Constitution's *ex post facto* clause as coextensive with its federal counterpart); *State v. Harris*, 414 S.W.3d 447, 449 (Mo. 2013) ("The Missouri Constitution's ban on *ex post facto* laws is coextensive with the United States Constitution's ban on *ex post facto* laws."); *In re Interest of J.R.*, 762 N.W.2d 305, 316 (Neb. 2009) (construing Nebraska's *ex post facto* clause "to provide no greater protections than those guaranteed by the federal Constitution"); *People ex rel. Birkett v. Konetski*, 909 N.E.2d 783, 800 (Ill. 2009) ("[T]he *ex post facto* clause in the Illinois Constitution does not provide greater protection than that offered under the United States Constitution."); *Kellar v. Fayetteville Police Dept.*, 5 S.W.3d 402, 405 (Ark. 1999) ("We have been given no reason why we should interpret Arkansas's *ex post facto* clause in a manner contrary to the *ex post facto* clause in the United States Constitution.").

(Alaska 2008) (holding that the United States Supreme Court's "intent-effects test provides an appropriate analytical framework" under the Alaska Constitution).

As always, there are a few exceptions. In 2013, a plurality of the Court of Appeals of Maryland held that the *ex post facto* clause of that state's constitution affords Marylanders more protection than Article I, Section 10 of the United States Constitution does. *Doe v. Dept. of Pub. Safety & Corr. Servs.*, 62 A.3d 123, 130-37 (Md. 2013). The court's departure from federal law was prompted by a very specific doctrinal glitch that arose from two nineteenth century Supreme Court cases. In the first of those cases, *Kring v. Missouri*, 107 U.S. 221 (1883), the Supreme Court defined *ex post facto* laws to include legislation that "alters the situation of a party to his disadvantage." *Id.* at 235. And in the second case, *Thompson v. Utah*, 170 U.S. 343 (1898), the Court held that a particular retroactive law violated the *ex post facto* clause because it deprived criminal defendants of "a substantial right." *Id.* at 352.

The language used in *Kring* and *Thompson* caused considerable confusion. Some state courts, like the Court of Appeals of Maryland, for example, seemed to read *Kring* and *Thompson* as alternatives to *Calder*'s four categories of *ex post facto* laws. *See Anderson v. Dept. of Health & Mental Hygiene*, 528 A.2d 904, 909 (Md. 1987) (stating that the *ex post facto* clause "embraces consequences affecting substantial rights if they 'disadvantage the offender'"); *State v. Rowe*, 181 A. 706, 709 (N.J. Sup. 1935) (listing six categories of *ex post facto* laws). Other courts continued to adhere to the Supreme Court's suggestion that the *ex post facto* clause does not turn on whether the defendant has suffered some sort of "disadvantage." *See Dobbert v. Florida*, 432

U.S. 282, 293 (1977) ("Even though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto*.").[9]

Eventually, the Supreme Court disavowed both *Kring*'s "disadvantage" standard and *Thompson*'s focus on "substantial rights," explaining that both approaches deviated from the original meaning of the term *ex post facto*. *Collins*, 497 U.S. at 50-52 (overruling *Kring* and *Thompson*). Despite this clarification, the Maryland Court of Appeals (or at least a plurality of the judges on the court) continues to adhere to the now-abandoned "disadvantage" standard as a matter of state constitutional law. *Doe*, 62 A.3d at 132-33. In so holding, the plurality repudiated aspects of the court's earlier *ex post facto* decisions, some of which treated the state and federal clauses as coterminous. *See e.g., Sec'y, Dept. of Pub. Safety & Corr. Servs. v. Demby*, 890 A.2d 310, 327 (Md. 2006) ("We have held that the *ex post facto* clause in the Maryland Declaration of Rights has the same meaning as the federal clause."); *Khalifa v. State*, 855 A.2d 1175, 1189 (Md. 2004) ("The *Ex Post Facto* Clauses of the United States Constitution and Maryland Declaration of Rights have been viewed generally to have the 'same meaning' and are thus to be construed in *pari materia*.").

Unlike the Maryland Court of Appeals, this Court has acknowledged that references in our prior decisions to laws that either implicate "substantial rights" or "disadvantage" a defendant "should not be read so as to enlarge the *Calder* categories beyond their meaning at the time of the adoption of the Constitution." *Young*, 637 A.2d at 1317-18; *see Fisher*, 741 A.2d at 1238 ("[T]he Constitution does not prohibit every retrospective law that alters a party's situation to his disadvantage."). Thus, the

---

[9] *See also Murphy v. Kentucky*, 465 U.S. 1072, 1073 (1984) (White, J., dissenting from denial of *certiorari*) (citing conflicting lower court decisions concerning the *ex post facto* clause's application to retroactive evidentiary and procedural rules).

Maryland court's departure from the prevailing federal constitutional standards provides no basis for this Court to follow suit.

The Supreme Court of Indiana is another tribunal that has diverged from United States Supreme Court precedent. Although the *Smith* intent-effects test is the "appropriate analytical framework for analyzing *ex post facto* claims under the Indiana Constitution," courts in that state do not subscribe to the view that *only the clearest proof* of a statutory scheme's punitive effect can negate the legislature's assertedly non-punitive intent. *Compare Smith*, 538 U.S. at 92 ("Because we ordinarily defer to the legislature's stated intent, . . . only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."), *with Wallace v. State*, 905 N.E.2d 371, 398 n.7 (Ind. 2009) ("[O]ur standard of review for challenges to the constitutionality of a statute has never included a clearest proof element."). Unlike the Supreme Court of Indiana, however, this Court has embraced *Smith*'s "clearest proof" requirement. *Lehman*, 839 A.2d at 272 ("[O]nly the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."); *cf. Stilp v. Commonwealth*, 905 A.2d 918, 939 (Pa. 2006) ("[A] legislative enactment will not be deemed unconstitutional unless it clearly, palpably, and plainly violates the Constitution.").

The lead opinion is not swayed by the number of states that have adopted federal constitutional standards for purposes of their own *ex post facto* clauses. According to the lead opinion, the Pennsylvania Constitution warrants unique treatment because, unlike some other state constitutions, ours protects the right to reputation. OAJC at 52-53. Along these lines, the lead opinion finds persuasive the fact that a few state high courts—in holding that retroactive sex-offender registration laws violate *ex post facto* principles—have "found harm to the reputations of offenders to be a factor in

their constitutional analysis." *Id.* Those courts have done so, the lead opinion continues, "even in the absence of a constitutional provision like Pennsylvania's to give special protection to [reputation] interest[s]." *Id.*

In my view, the fact that our state Constitution protects reputational rights (PA. CONST. Art. 1, § 1) has little bearing on the question before us.[10] As explained, the critical inquiry for purposes of the *ex post facto* clause, as we have understood it for more than two centuries, is whether the law at issue constitutes "punishment." Harm to reputation *may* help us to answer that question, but only because public ridicule and vilification of those who commit crimes historically has been (and sometimes still is) used as form of punishment. *See Smith*, 538 U.S. at 97 ("Some colonial punishments indeed were meant to inflict public disgrace. Humiliated offenders were required 'to stand in public with signs cataloguing their offenses.'") (quoting Adam Jay Hirsch, *From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts*, 80 MICH. L. REV. 1179, 1226 (1982)); *Gaffney*, 733 A.2d at 620 (distinguishing sex-offender registries from the colonial-era punishments of "shame" and "ignominy" described in Nathaniel Hawthorne's *The Scarlet Letter* (1850)). This is why, as the lead opinion notes, some courts will discuss a law's impact on an offender's reputation even in the absence of an explicit constitutional right to reputation. But it is not a reason to depart from federal constitutional standards, which already require courts to consider such concerns. *See e.g., Mendoza–Martinez*, 372 U.S. at 168 (holding that courts must analyze both whether a sanction "has historically been regarded as a punishment" and whether it "will promote the traditional aims of punishment").

---

[10] If anything, the very existence of a reputation clause suggests that the drafters of our constitution believed that the right was not protected sufficiently by other provisions of the Declaration of Rights.

Given these points, the case law from other jurisdictions does not convince me that the lead opinion's interpretation of the Pennsylvania Constitution is warranted. To the contrary, the experiences of our sister courts persuade me that we should err on the side of restraint when considering a departure from federal constitutional standards. *Compare Miller v. State*, 584 S.W.2d 758, 762 (Tenn. 1979) (holding that the *ex post facto* clause of the Tennessee Constitution extends beyond the limits of its federal counterpart), *with State v. Pruitt*, 510 S.W.3d 398, 416 (Tenn. 2016) ("There is simply nothing in the text of our constitution nor in our history that supports the *Miller* Court's holding that the meaning of '*ex post facto*' in Tennessee is more expansive than the definition provided by Justice Chase in 1798.").

## IV.    Policy Considerations

Muniz's discussion of *Edmunds*' policy prong is quite limited; he merely asserts that the Commonwealth "has an interest in the finality of sentencing." Brief for Muniz at 31. Muniz does not explain why this alleged interest supports the view that Pennsylvania's *ex post facto* clause prohibits laws other than those which constitute "punishment." Nor does he clarify why sentencing finality is an interest unique to Pennsylvania. (Surely, every state would have a similar "interest" in the finality of criminal sentences.) And to make matters worse, Muniz has not even bothered to discuss the *ex post facto* clause's "application within the modern scheme of Pennsylvania jurisprudence." *Edmunds*, 586 A.2d at 901.

In short, Muniz's argument here "falls short of the kind of searching inquiry required" to justify a departure from federal *ex post facto* precedent, *Commonwealth v. Russo*, 934 A.2d 1199, 1212 (Pa. 2007), and the lead opinion does not supply any pertinent policy concerns that Muniz may have overlooked.

## V.    Conclusion

Neither Muniz nor the lead opinion offer much to undermine the perception that—as the text and history of our Constitution seem to require, as those who wrote it seemed to expect, and as our past cases have all suggested—the state and federal *ex post facto* clauses are coterminous. Nonetheless, as the lead opinion's thorough analysis makes clear, OAJC at 27-45, applying the federal *ex post facto* standards also leads to the conclusion that SORNA is punitive and cannot be applied retroactively. Thus, I join parts I-IV and VII of the lead opinion, and otherwise concur in the result.

Justice Todd joins this concurring opinion.